UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

    v.                                                         Cr. No. 15-001-ML

JUSTIN GRAHAM

**MEMORANDUM AND ORDER**

      On January 17, 2015, Justin Graham ("Graham") was indicted by a federal grand jury for two counts of possession with intent to distribute a mixture and substance containing a detectable amount of methylenedioxymethamphetamine (MDMA) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Dkt. No. 9). The matter is before the Court on Graham's motion to suppress all physical evidence seized from his home on December 10, 2014, as well as any statements Graham made after he was arrested on that same day. Def.'s Mot. Suppress at 1 (Dkt. No. 21). The Government has objected (Dkt. No. 22-1).

      On August 24, 2015, the Court conducted an evidentiary hearing on Graham's motion to suppress, during which the government presented the testimony of two witnesses and several exhibits. At the conclusion of the hearing, the Court requested additional briefing on the issue of probable cause as it relates to the specific facts of this case. On August 31, 2015 and September 2, 2015, respectively, the parties submitted supplemental memoranda on

the issue of probable cause. (Government, Dkt. No. 31; Defendant, Dkt. No. 32). The matter is now in order for a decision.

**I. Factual Background**

The Court makes its factual determinations based on the testimony of Postal Inspector James Foley ("Foley") and HIDTA[1] task force member Mario Cerullo ("Officer Cerullo"), both of whom the Court found to be credible and candid, as well as the physical evidence presented at the hearing.

Graham was arrested in his residence on December 10, 2014 after he accepted delivery of a package addressed to Ryan Smith. Subsequent to Graham's arrest, members of the HIDTA task force conducted a "protective sweep" of his residence, during which they found bags of pills and several weapons. Officer Cerullo of the task force read Graham his Miranda rights, after which Graham identified his bedroom; Graham refused, however, to give consent to the officers to open the package he had just taken possession of from Foley.

Based upon certain information Foley had collected prior to Graham's December 10, 2014 arrest, and the items observed by the police "in plain view" during the sweep of Defendant's home (pills and weapons), the police secured a search warrant from a state court judge. After receipt of the warrant, the package was opened and found to contain a controlled substance.

---

[1] High Intensity Drug Trafficking Area program

Foley has been a postal inspector for seven years. He has received training on narcotics trafficking through the U.S. Postal Service. Foley's training included how to identify packages and originating countries with regard to drug trafficking. In the Spring of 2014, Foley began investigating packages from China which were shipped to 1205 Hill Farm Road in Coventry, Rhode Island. Foley set up a "parcel watch," which gave him notice any time a parcel addressed to the Hill Farm Road address came in. Foley also testified that China is a source to the United States for synthetic drugs.

On March 12, 2014, Foley received notice of a package that was at the Coventry post office for delivery to 1205 Hill Farm Road. Foley went to the post office and looked at the outside of the package. Although he looked at the label and wrapping, he could not tell if the sending address was in China because "it was in Chinese writing" and Foley does not read Chinese. The package was addressed to Chris Bernard at 1205 Hill Farm Road. Foley checked the CLEAR[2] database to see if any individual by that name "came back" to that address, but the name Chris Bernard was not listed for that address in the database. Foley testified that the fact that the name on the package was not associated with the address was significant because "it's common with narcotics parcels. They'll have a good delivery address, but have a fictitious name."

---

[2] The acronym was not further explained.

On March 12, 2014, Foley delivered the package to 1205 Hill Farm Road. Graham came to the door, and after being advised by Foley that the package was for Chris Bernard, Graham signed a receipt and took possession of the package. Foley testified that he did not arrest Graham at that time because he was "building an intelligence on the parcel" and he didn't know if it contained narcotics "or what," so the delivery was "more or less to identify who was receiving the parcel."

In November 2014, Foley received an alert that another package addressed to 1205 Hill Farm Road had come in. Foley went to the post office to retrieve the package. He observed the label which indicated that the sender was "Shanghai Jifeng." Foley next checked the "prohibited mail narcotics" database for "Shanghai Jifeng." He learned that there were multiple listings of Shanghai Jifeng as the sender of seized parcels containing controlled substances. Foley found that, at that point, fourteen such parcels had been entered in the system in the preceding six months. Foley acknowledged, however, that he had no way of knowing how many legitimate packages had been shipped by Shanghai Jifeng to the United States during that time frame and he conceded that it could be "millions."

On November 10, 2014, Foley delivered the package from Shanghai Jifeng to 1205 Hill Farm Road. This second package was addressed to "Ryan Smith." Foley had checked that name in the CLEAR database, and, again, found no listing for a Ryan Smith at that

address. Foley rang the doorbell, told Graham the package was for Ryan Smith, and Graham took possession of it and signed the receipt "Justin G."

From the time he made the March 12, 2014 delivery through November 10, 2014, when he made the second delivery, Foley did minimal investigation regarding Graham. Foley testified that he ran a report on the vehicle registration on the car parked at 1205 Hill Farm Road on March 10, 2014 and found that it was registered to Graham. Foley did no surveillance of 1205 Hill Farm Road. He did "pull" information from the CLEAR database and got Graham's "information," although it is unclear what "information" was included in that report.

On December 8, 2014, Foley got an alert from the post office that there was a third package for 1205 Hill Farm Road. Foley notified Detective Schatz of the HIDTA task force (as he had done in March 2014) and they decided to do a controlled delivery. Foley saw that the third package was shipped by Shanghai Jifeng and that it was addressed to "Ryan Smith." Foley acknowledged that the operational plan with HIDTA included the planned arrest of Graham upon his acceptance of the package from Foley.

On December 10, 2014, Foley drove a white van to Graham's residence to make the delivery. The van, rather than a postal vehicle, was used on this occasion in order to secret six HIDTA task force agents who, on signal from Foley, were to effectuate

Graham's arrest. Foley rang the doorbell and when Graham came to the door, Foley told him he had a package for Ryan Smith. When Graham took possession of the package from Foley and Foley gave the verbal signal, task force members exited the van and identified themselves as police. Foley testified that Graham then "retreated" into the house, that is, Graham "took a couple of steps inside the house" where he was quickly placed under arrest by task force agents.

Foley testified that on the day the third package was delivered, he believed there was "some type of controlled substance" in it. That "belief" was based on the previous seizures of packages from the same sender, the use of what he believed were "multiple . . . fictitious" names, and the fact that Graham was the one person receiving the parcels.

On cross examination, Foley stated that he did not know what was in the first package and that he did not arrest Graham in March 2014 because he did not believe he had probable cause to do so at that time. Foley conceded that he did not arrest Graham when he took possession of the second package in November 2014 because he did not have probable cause to do so at that time either. Foley also agreed that he did not know what was in the second package or the package that was delivered on December 10, 2014. The packages were not X-rayed or subjected to a sniff test by trained canines. When asked why he did not seek a search warrant for the package,

Foley explained that, because the state police would be "lead" on the investigation, it was their decision not to seek a warrant after discussing the advisability of getting a warrant with Foley. When pressed by the Court as to whether Foley told HIDTA that he did not know what was in the package, he conceded that he did not "specifically say that." He said that he told them he "believe[d] there was some type of controlled substance in there."

The shipping label for the third package was admitted into evidence as Government Exhibit #3. The contents are listed as VAZ ZMULCOLD [sic] POWDER POLY. The shipping label for the package delivered in November 2014 (Government Exhibit #2) lists sodium alginate and the label for the March 2014 package (Government Exhibit #1) lists saccharin sodium salt. Foley testified that the fact that the labels listed chemical compounds was significant because the seizures listed in the prohibited narcotics database included "some type of chemical" in the declaration portion of the label. On cross examination, Foley conceded that one of the labels listed "toy lamps" as the contents of the package.

The government also presented the testimony of Officer Mario Cerullo, who was one of the six agents present in the white van on December 10, 2014. Officer Cerullo has served on the West Warwick, Rhode Island, police force for eight years. At the time of Graham's arrest, Officer Cerullo had been with HIDTA for six to seven months. Officer Cerullo got involved with the investigation of

Graham approximately two to three days before the package was delivered on December 10, 2014. Foley told Officer Cerullo that he (Foley) believed the package contained controlled substances and, based on those representations, a decision was made to attempt a controlled delivery. The day before the controlled delivery was to be made, Officer Cerullo and Detective Schatz conducted surveillance of 1205 Hill Farm Road. They saw Graham come out of the house, enter a blue Hummer H3 parked in the yard, and drive to his parents' home. No other vehicles were observed at 1205 Hill Farm Road.

Officer Cerullo outlined the plan for the controlled delivery on December 10, 2014. He and five other HIDTA task force members waited in the van while Foley made the delivery.[3] On signal from Foley, task force members would "intercept" whoever had taken possession of the package and "try to get consent" to open the package. Officer Cerullo stated that he was the fourth person to exit the van. He observed Graham holding the package and starting to move backward ("back pedal") into the house.  The agents told Graham to stop; Graham continued to retreat. At that point, the agents were in the house and "took custody" of ("detained") Graham. Officer Cerullo said he could hear dogs barking and other people in the residence, so they "cleared" the house for officer safety.

---

[3] There were a total of ten agents on site – four were in vehicles outside the property.

Graham was escorted to a study; the other people in the house were detained and "spoken to." Detective Schatz advised Officer Cerullo that during the protective sweep, weapons and bags of pills were located in a room in the basement.

Officer Cerullo read Graham his Miranda rights and when Graham said he understood, Officer Cerullo asked him if he lived there, to which Graham responded yes. Graham was then asked where his bedroom was; Graham said it was on the lower level and pointed to its location. Officer Cerullo asked what Graham did for work; Graham said that he had served in the Air Force as a military police officer, but that he was now disabled. Officer Cerullo asked if the package that had been delivered by Foley was his and Graham responded "yes." When Officer Cerullo asked for Graham's consent to open the package, Graham said "no," and when Officer Cerullo asked what was in the package, Graham said he would not answer any more questions, at which point the interview was terminated.

After Graham was in custody and the protective sweep had been completed, two affidavits were prepared (one for the package, the other one for the house). The affidavit for the package included all the information of the investigation up to the point of delivery as well as Graham's admission to Officer Cerullo that the package was his and Graham's refusal of consent to search the package. (Government Exhibit #5). The affidavit for the search of Graham's residence also included the discovery of guns and bags of

pills during the protective sweep conducted after Graham's arrest. (Government Exhibit # 6). Based upon the affidavits submitted, search warrants were issued by a state court judge. Once the search warrant was issued, the package was opened and found to contain a clear plastic bag containing a tan rock-like substance similar in appearance to MDMA. A field test was positive for the presumptive presence of MDMA (ecstacy). The gross weight was 1.141 kilograms.

The search warrant for the house was also executed. In Graham's bedroom, investigators seized 1830 orange and white pills. A field test was positive for presumptive MDMA. Two soda cans and a salt container with hidden compartments were seized, as well as plastic baggies and two digital scales. In addition, three firearms and ammunition were seized.

**II.  Motion to Suppress (Dkt. No. 21)**

Graham argues that his warrantless arrest was illegal because the HIDTA agents who arrested him immediately upon receipt of the package lacked probable cause to effect such an arrest. Graham further asserts that the agents planned to arrest him and conduct a search inside his residence because of a mere suspicion that the package delivered to him on December 10, 2014 contained contraband. Graham points out that neither Foley nor the HIDTA agents conducted a prior inspection or search of the package; they did not observe Graham acting criminally or suspiciously; and they had no information to allow for a reasonable inference that any criminal

activity occurred at Graham's residence.

Regarding the search of his residence, Graham suggests that the HIDTA agents used his anticipated return into his home after taking delivery of the package to justify their entry and the initial search of his residence. Because this initial search occurred following the illegal arrest of Graham and the illegal entry into his home, Graham argues that any items observed by the agents must be suppressed. According to Graham, because any statements he made followed his illegal arrest, such statements must be suppressed as well.

### III. The Government's Response (Dkt. No. 22-1)

The government takes the position that, based on the totality of the circumstances, there was sufficient probable cause to support Graham's warrantless arrest. Specifically, the government argues that, based upon the investigation conducted by Foley, there was probable cause to believe that the package shipped from Shanghai Jifeng to Graham's residence contained controlled substances because it was known to Foley that (1) China is a source country for illegal controlled substances that are smuggled into the United States; and (2) on fourteen prior occasions, packages shipped from Shanghai Jifeng to the United States between June 2014 and December 2014 contained controlled substances. The Government points out that Foley's investigation failed to establish that two other individuals, on whose behalf Graham had previously accepted

delivery of three packages from China, were actually associated with Graham's address. According to Inspector Foley, he was also aware that individuals who traffic narcotics through the United States Postal Service may use fictitious names to avoid detection by law enforcement.

Finally, the government suggests that the warrantless entry into Graham's residence was made in "hot pursuit" of Graham, coupled with the exigent circumstance that Graham would be in a position to destroy the evidence.

**IV. Standard of Review**

Under the Fourth Amendment, police officers are generally required to secure a warrant supported by probable cause before they effect a search or seizure or a non-consensual entry into a person's residence. Macdonald v. Town of Eastham, 745 F.3d 8, 12 (1st Cir. 2014)(citing Georgia v. Randolph, 547 U.S. 103, 109, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006)).

In a situation where officers enter without a warrant and without consent, "their actions must fall within some recognized exception to the warrant requirement." Macdonald v. Town of Eastham, 745 F.3d at 12 (citing United States v. Romain, 393 F.3d 63, 68 (1st Cir.2004)). The First Circuit has instructed that a "warrantless entry into a person's dwelling may be permitted" to effect an arrest, United States v. Samboy, 433 F.3d 154, 158 (1st Cir.2005), provided that two conditions are met: (1) the police had

probable cause to enter the home; and (2) there are "exigent circumstances" or another recognized exception to the warrant requirement applies. United States v. Ramirez-Rivera, ---F.3d---, 2015 WL 5025225 at *15 (1st Cir. Aug. 26, 2015)(quoting Hegarty v. Somerset Cty., 53 F.3d 1367, 1373-74 (1st Cir.1995)).

Accordingly, the arrest of an individual must be supported by probable cause. United States v. Mercedes-De la Cruz, 787 F.3d 61, 68-69 (1st Cir. 2015)(citing Kaupp v. Texas, 538 U.S. 626, 630, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (per curiam), which is an "obviously" higher burden than reasonable suspicion, Navarette v. California, ---U.S.---, 134 S.Ct. 1683, 1687, 188 L.Ed.2d 680 (2014) (internal quotation marks omitted)". Probable cause sufficient to support an arrest requires a showing of "reasonably trustworthy facts and circumstances [that] would enable a reasonably prudent person to believe that the arrestee has committed a crime." Robinson v. Cook, 706 F.3d 25, 33 (1st Cir. 2013) (citing Devenpeck v. Alford, 543 U.S. 146, 152-54, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004); United States v. Jones, 432 F.3d 34, 41 (1st Cir.2005)).

As to a search of an individual's residence, "under the 'probable cause' standard, the 'totality of the circumstances' must demonstrate 'a *fair probability* that contraband or evidence of a crime will be found in a particular place.'" United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996)(quoting Illinois v.

Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); United States v. Ramirez-Rivera, ---F.3d---, 2015 WL 5025225 at *14 (noting that the task is "simply to make a practical, common-sense decision whether, given all the circumstances, there is a fair probability that contraband or evidence of a crime will be found at a particular place.")(citing United States v. McLellan, No. 14-1561, 2015 WL 4071914, at *4 (1st Cir. July 6, 2015)).

In addition, a warrantless entry into a residence may be effected based up "exigent circumstances," if the arresting officers reasonably believe "that there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant," as "when delay would risk the destruction of evidence." Macdonald v. Town of Eastham, 745 F.3d at 14 n. 3 (quoting United States v. Samboy, 433 F.3d at 158). However, the First Circuit has "refused to find exigent circumstances where the 'circumstances [were] created by government officials who unreasonably and deliberately delay[ed] or avoid[ed] obtaining the warrant.' United States v. Samboy, 433 F.3d at 160 (quoting United States v. Rengifo, 858 F.2d 800, 804 (1st Cir.1988)).

**V.   Discussion**

After considering the testimony of Foley and Officer Cerullo and reviewing all the evidence submitted by the government, the Court is compelled to conclude that, given all the circumstances leading up to and surrounding Graham's arrest, there were

insufficient grounds for a finding of probable cause to support either the arrest or the entry into Graham's residence.

To summarize, Foley's investigation was limited to determining the following: (1) some, but not all of the packages[4] addressed to Graham's residence were sent by Shanghai Jifeng; (2) fourteen seized parcels (of an unknown total number of legitimate packages, possibly in the millions) sent by Shanghai Jifeng to the United States contained controlled substances; (3) some, but not all of the fourteen packages described their contents as "chemicals;" and (4) the two individuals to whom the three packages were addressed were not, according to the CLEAR database, associated with Graham's address. In addition, Foley relied on his general knowledge that (1) China is an exporter of controlled substances, and (2) individuals dealing in such substances may use fictitious names.

As Foley acknowledges, he did not know what was in any of the three packages; nor were any efforts made to ascertain their contents, *e.g.,* x-ray the packages or subject them to a canine sniff test. Likewise, there was no significant surveillance conducted of Graham or his residence, other than observing a car parked in his driveway and following Graham to his parents' house. As Foley also candidly stated, there was no probable cause to arrest Graham at the first or second controlled delivery; he failed

---

[4] Foley did not attempt to ascertain who sent the first parcel which contained a label in Chinese.

to establish, however, how that situation changed and why the third delivery was sufficient to support a finding of probable cause. Rather, the decision to effect an arrest of Graham was made prior to the third delivery. According to Officer Cerullo, he did not know who would take delivery of the third package; rather, the plan was to intercept any individual who signed for the package. Even when viewing all the facts leading up to Graham's arrest and entry into his residence in combination, those facts were insufficient to support a fair probability that Graham had committed a criminal act and/or that contraband or evidence of a crime would be found at his residence.

The circumstances of the third delivery, leading to Graham's arrest and entry into his residence were equally insufficient to constitute "exigent circumstances" or "hot pursuit." As Foley candidly acknowledged, the decision to effect an arrest had been made prior to delivering the third parcel and with no more evidence to establish probable cause than what existed at the two prior deliveries. Although the possibility of obtaining a warrant had been discussed by Foley and the HIDTA task force, a decision was made not to seek a warrant and to arrest Graham at the third controlled delivery. There was no attempt to bolster Foley's suspicion (proved correct by subsequent events) that the third package, or either of the previously delivered packages, contained controlled substances. No information was obtained about any

16

legitimate goods the shipper may have sent to the United States. Moreover, as Foley acknowledged, China is the source of many goods, and other countries are also sources for narcotics.

Finally, Graham's conduct, to the extent it was observed during limited surveillance, yielded no information that would indicate he was committing any criminal acts. The plan was for Graham to be arrested as soon as he had signed for the parcel. Once Graham signed for the parcel and all six task force members exited the white van, wearing vests and calling "Stop, Police," Graham retreated back into his house; as Officer Cerullo confirmed, Graham did not turn and run, he simply backed away. Based on those facts, a claim for hot pursuit or other exigent circumstances is unsupported.

In sum, the totality of the circumstances in this case fails to demonstrate a fair probability that Graham had engaged in criminal activity or that contraband or evidence of a crime would be found at his residence. Although Foley may have had suspicions about the content of the packages or about Graham's activities related thereto, the facts underlying Foley's suspicions were insufficient to support a finding of probable cause.

## Conclusion

For the reasons stated above, Graham's motion to suppress the evidence discovered and seized from his residence following his arrest on December 10, 2014, as well as any statements he made on

that day is GRANTED.

SO ORDERED.

/s/ Mary M. Lisi

Mary M. Lisi
Senior United States District Judge

October 5, 2015